IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NICOLAS WILSON, | § | |
| SPN #481652, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-13-0130 |
| | § | |
| JANE DOE NURSE, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM AND ORDER</u>

Montgomery County Jail inmate Nicolas Wilson (SPN #481652) has filed a *pro se* complaint under 42 U.S.C. § 1983, alleging violations of his civil rights in connection with the conditions of his confinement at the Harris County Jail (collectively, "HCJ"). Wilson complains that he was denied adequate medical care after he developed appendicitis. He further complains that a guard used excessive force against him and that he was denied access to the courts.

Defendants Sheriff Adrian Garcia, Nurse Mary Bocage, and Deputy Charles Ballard have filed a motion for summary judgment supported by Wilson's medical records, jail records, and affidavits [Doc. # 41]. Wilson has not responded to defendants' motion. After reviewing the pleadings, all matters of record, and the applicable law, the Court concludes that defendants' motion should be **granted** and the complaint must be **dismissed** for the reasons set forth below.

I.     **FACTUAL BACKGROUND**

    A.     **Wilson's Claims and Allegations**

Wilson sets forth his claims and supporting allegations in his original complaint [Doc. # 1] and his response to Court's order for more definite statement of facts [Doc. # 9].

      1.     **Appendicitis**

Wilson claims that Nurse Mary Bocage was deliberately indifferent to his serious health needs by denying him medical care when he developed appendicitis.  He states that, while incarcerated as a pretrial detainee in the HCJ, he developed symptoms indicating that he was suffering from the ailment during a three day period at the end of July, 2011 [Doc. # 13, pp. 3-5].  He alleges that his requests for medical treatment were refused because he is mentally handicapped and the HCJ and its employees follow a practice of denying medical care to people such as him because their mental deficiencies make it difficult for them to seek help.  *Id.* at 5.

Wilson contends that it was obvious at the time that he had appendicitis (or some serious ailment) and needed medical attention because he was vomiting, shaking, sweating, and running a dangerously high fever.  *Id.* at 7.  He also alleges that his blood pressure dropped and that he lost the ability to eat, drink, or go to the bathroom.  *Id.*  In addition, Wilson asserts that he was lying on the floor while writhing in pain and that he became unresponsive as his body began to shut down.  *Id.*  He states that the attending nurse refused to help him despite his obvious distress.[1]

---

[1]     Wilson was unable to name Nurse Bocage when he submitted his complaint and more
(continued...)

2

Wilson further alleges that he suffered tremendously after his appendix ruptured and that he was slowly dying over the three day period because Defendants knowingly refused to take any action to save his life until a jail supervisor ordered him moved to the jail clinic [Doc. # 1, p. 12; Doc. # 13, p. 5].  Wilson states that he was rushed to the hospital by ambulance only when he was close to death [Doc. # 1, p. 12].  Once at the hospital, he was immediately diagnosed and underwent an emergency appendectomy.  *Id.*  He states that he continues to suffer abdominal pain and digestive problems two years later due to the delay in treating his appendicitis.  *Id.*

### 2.     Excessive Force

Wilson complains that Deputy Ballard used excessive force against him while he was still recovering from his appendectomy [Doc. # 1, pp. 6-7].  He states that, after the surgery, he was returned to the HCJ still in tremendous pain and unable to walk without assistance [Doc. # 13, p. 8].  Wilson was on crutches and had a three foot drain tube draining his abdomen into a fluid collection bag.  *Id.*  Because of his incapacitation and apparent distress, Wilson's nurse instructed him to sit at a table in the day room and wait for her to return with an injection to treat his pain.  *Id.*

While Wilson was waiting for the nurse to return with his shot, Deputy Ballard[2]

---

[1](...continued)
definite statement.  Bocage's identity was not revealed until the Harris County Attorney's Office filed an answer in her behalf [Doc. # 36]

[1]     Wilson did not know Deputy Ballard's name when he submitted his complaint and more definite statement.  Ballard's identity was not revealed until the Harris County Attorney's Office filed an answer in his behalf [Doc. # 37].

entered the room and told Wilson to go to his bunk.  *Id.*  Wilson, who is 5' 3" tall and weighs 145 pounds, explained that he was following the nurse's instructions and that he could not walk [Doc. # 1, p. 7; Doc. # 13, p. 8].  Wilson alleges that Ballard answered with an expletive and then assaulted him without provocation [Doc. # 13, p. 8].  Wilson describes Ballard pulling him out of his seat and throwing him on the floor [Doc. # 1, p. 7].  Ballard allegedly beat Wilson's face and head with his fists.  *Id.*  Ballard then placed his knee in Wilson's back, applying force behind the area where his appendix had been removed.  *Id.*  Wilson states that Ballard ripped the tube from his abdomen, tearing it open, and twisting his intestines [Doc. # 13, p. 9].  He also asserts that he sustained dislocated shoulders, loosened teeth, a broken jaw, and a multitude of bumps and bruises from the assault.  *Id.*

Wilson states that, after the assault, he was rushed back to the hospital for an emergency surgery to reinstall the tube and close his ripped abdomen.  *Id.*  He further states that his jaw was wired shut, but that he still needs further surgery to correct his jaw fracture which does not hinge properly.  *Id.* at 9-10.  In addition, Wilson claims that his shoulders still constantly hurt and that his abdomen feels tight.  *Id.*  He also complains of digestive issues, crooked teeth, a speech impediment, and an inability to run or jump.  *Id.*

### 3.     Access to Courts - Grievances

Wilson contends that Sheriff Garcia violated his right of access to the courts because he was not provided assistance in gaining meaningful access to the HCJ grievance process [Doc. # 13, p. 12].

Wilson complains that Sheriff Garcia is responsible for the violations of his right of

access to the courts because he permitted a guard who was not trained to deal with mentally handicapped inmates to be responsible for Wilson's welfare [Doc. # 1, p. 14].  Wilson alleges that he asked for assistance in filing grievances but none was ever provided.  *Id.*  Wilson asserts that he is mentally challenged and needed help in exhausting the grievance process regarding the claims raised in this proceeding.  [Doc. # 13, p. 12]. When asked by the Court whether he was substantially delayed or prevented from seeking review of his claims, Wilson answered he did not know for sure because the HCJ administration refused to return copies of his grievances to him.  *Id.* at 13.  However, Wilson contends that he must have exhausted the required grievance procedures because the Texas Commission on Jail Standards accepted and responded to his complaint.  *Id.*

### B.   <u>Defendants' Responses</u>

Defendants have filed a motion for summary judgment under Fed. R. Civ. P. 56(c) [Doc. # 41] disputing Wilson's allegations and claims of deliberate indifference to his medical needs, excessive use of force, and denial of access to the courts.  They contend that Wilson's serious medical needs were met in response to his appendicitis.  They further contend that Deputy Ballard's use of force was justified because Wilson refused to obey Ballard's orders and assaulted Ballard instead.  They contend that a physical examination after the altercation revealed that Wilson sustained no injuries.  Defendants contend that, contrary to the allegations, Wilson was able to utilize the grievance system and was not denied access to the courts.  Defendants also assert the defense of qualified immunity and contend that all claims for damages against them in their official capacities are barred.

5

### 1.    Appendicitis

Defendants' evidence shows without contradiction that on July 18, 2011 at 2:30 a.m., Wilson first reported to a nurse that he was suffering from abdominal pain [Doc. # 41-2, pp. 3-4].[3]  Wilson complained of sharp pains to the left side of his abdomen and reported that he had been nauseous and vomiting for the previous 12 hours.  *Id.*  He also reported that food exacerbated his condition.  Nurse Bocage noted Wilson's complaints and took his vital signs [HCSO pp. 375, 377].  She then referred Wilson to a physician.  *Id.*

The attending physician performed a nonspecific examination and postulated that Wilson's ailment was possibly gastroenteritis [Doc. # 41-2, p. 3].  Wilson was referred for x-rays and was given an injection of Phenergan, a medication used to control nausea.  Wilson's x-rays revealed a nonspecific bowel gas pattern but no acute findings, including appendicitis.  *Id.*

When Wilson was evaluated again, less than seven hours later at 9:00 a.m., July 18, 2011, it was determined that his condition had deteriorated.  *Id.*  It was observed that he was uncomfortable and unable to stand straight.  After noting decreased bowel sounds and

---

[2]    Wilson's attack of appendicitis and its treatment are summarized in a sworn affidavit by Michael M. Seal, M.D., Director of Medical Services for Harris County Jail.  Seal's report is based on and supported by Wilson's Harris County Sheriff's ("HCSO") records [Doc. # 42] which are filed under seal and paginated by the HCSO.  The records verify that Wilson was treated for appendicitis within 7 hours after he first reported symptoms [HCSO pp. 377, 379].  They also reveal that Wilson had been treated for asthma for several days before his appendicitis episode [HCSO pp. 380, 382].  In addition, Wilson was treated for schizophrenia and bipolar disorders after having been a patient at the Rusk State Mental Hospital [HCSO pp. 416, 452-455].  The attached Rusk State Hospital records reveal that Wilson had previously been suffering from a dislocated mandible and that his jaw had been wired shut sometime during the early part of 2011 [HCSO pp. 487-494].

"diffuse tenderness with guardedness," the attending physician transferred Wilson to the LBJ hospital for an abdominal work-up [Doc. # 41-2, p. 3].  On that same date, doctors at LBJ performed laparoscopic surgery on Wilson for perforated acute appendicitis.  *Id.*  Wilson returned to the HCJ and was admitted to the infirmary on July 23, 2011.  *Id.*  He was subsequently readmitted to LBJ Hospital for abdominal pain, and he received a per cutaneous (trans-dermal) drain after he was diagnosed with an intra-abdominal abscess.  *Id.*

### 2.    Excessive Force

Deputy Charles Ballard, the defendant Wilson accuses of using excessive force, submitted an "Inmate Offense Report" regarding Wilson on August 8, 2011, the date of the alleged assault on Wilson [HCSO p. 149].  At approximately 9:00 p.m. that evening, Deputy Ballard, who worked as a detention officer in the jail infirmary, noticed that inmates from one section of the infirmary were communicating with inmates in another section  [HCSO p. 149].  Deputy Ballard ordered the inmates to report to their assigned bunks, and all complied except Wilson.  *Id.*  Ballard ordered Wilson to report to his bunk five times, but Wilson refused and stated that he would not move until he saw a nurse for his abdominal pain.  *Id.*  Ballard had previously consulted with the nurses who acknowledged that Wilson had been complaining that day about his abdomen and they stated that they would see Wilson when they made their normal scheduled rounds.  *Id.*

Deputy Ballard called Deputy Paul Brown to relieve him so that he could consult with a nurse at the infirmary as to whether Wilson could be moved to another cell for being disruptive and refusing to obey an order.  *Id.*  After the nurse agreed that removal was

appropriate, Ballard returned to the area where Wilson was sitting and ordered him once again to leave the area. *Id.* When Wilson refused and became argumentative, Ballard grabbed him by the sleeve to pull him up so that he could place restraints on Wilson. *Id.* Wilson started to get up, but then immediately fell to the floor. Ballard then attempted to stand Wilson up, but he would not cooperate. *Id.* Instead, Wilson began twisting his body and tried to pull away from Ballard. *Id.* Ballard was surprised by Wilson's behavior because he was normally physically compliant. *Id.*

Deputy Ballard grabbed Wilson's shirt and again attempted to stand him up, but Wilson slid out of his shirt [HCSO p. 149]. Ballard then grabbed Wilson's wrist and moved him into the hallway. *Id.* Once they were out in the hallway, Wilson grabbed at Ballard and pulled one of Ballard's hands to his mouth in an apparent attempt to bite it. *Id.* Deputy Ballard resisted Wilson's efforts to bite him, and Wilson slapped at Ballard's arms in an attempt to gain control over him. In response, Deputy Ballard ordered him to stop slapping and lay on his stomach. *Id.* Wilson continued to struggle, and Ballard freed his right hand from Wilson's grasp and pushed Wilson's face away from him causing Wilson to roll over on his stomach. *Id.* Deputy Ballard was then able to gain control of Wilson's hands and placed them behind his back. *Id.* Wilson was then removed to a cell. *Id.*

Deputy Brown, who had been called to relieve Ballard, witnessed the incident and reported that Wilson had refused to follow Ballard's orders [HCSO p. 151]. Deputy Brown also confirmed Ballard's account of the physically altercation and noted that Wilson looked as if he were about to bite Ballard. *Id.* Deputy Ballard notified Sergeant H. Barrera about

the incident, and Sergeant Barrera referred the incident for review [HCSO p. 152].

Wilson was taken to the infirmary for a medical examination by a nurse [HCSO p. 154]. The nurse reported that there were no open wounds or visible injuries. *Id.* Wilson's breathing, pulse, and blood pressure readings were normal and he appeared in no physical distress. *Id.* Although Wilson walked with a stooped shoulder, he admitted that he had always walked that way and that he could not stand up straight. *Id.* The nurse noted that Wilson would continue to be monitored in the infirmary. *Id.* Photographs taken of Wilson at or near the time of the physical examination reveal no apparent injuries [HCSO pp. 54-62].

Wilson was charged with assaulting an officer [HCSO p. 146]. He pled guilty to the charge on August 18, 2011, and signed a statement acknowledging his guilt and his right to a hearing. He was disciplined with a loss of 30 days of visitation and commissary privileges. *Id. See also* HCSO p. 135.

### 3.    Access to Courts - Grievances

Although Wilson alleges that he was denied access to the grievance system, the jail records reflect that he successfully accessed the system on July 18, 2011; September 19, 2011; October 4, 2011; October 6, 2011; and October 17, 2011 [Doc. # 41-3, pp. 4, 6]. In addition, jail records reflect that Wilson was able to send out correspondence airing his grievances with the Texas Commission on Jail Standards [Doc. # 41-3, p. 7]. The correspondence from Anthony Mikesh, a program specialist, reflects that the Commission received his allegations about being denied medical care for his appendicitis [Doc. # 41-3, p. 7]. It also acknowledge receipt of a complaint about Deputy Ballard's alleged use of

excessive force.  *Id.*  Finally, the letter addressed Wilson's complaint about being denied access to the grievance system.  *Id.*  In all instances, the Jail Commission determined that no violations had occurred.  *Id.*

## II.   STANDARD OF REVIEW

### A.   Motion for Summary Judgment

A movant is entitled to summary judgment if he shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012).  In considering such a motion, this court construes "all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (internal citation and quotations marks omitted).  For summary judgment, the movant has the burden of showing that there is an absence of evidence to support the nonmoving party's case.  *Celotex*, 477 U.S. at 325.  In doing so, the movant must establish the "absence of evidence to support an essential element of the non-movant's case."  *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal citations omitted).  The motion for summary judgment must be denied if the movant fails to meet this initial burden. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001).  However, if the movant does succeed in meeting this burden, the non-movant must go beyond the pleadings and identify specific facts showing that there is a genuine issue of a material fact warranting trial.  *Id.*

To prove there is an absence of evidence in support of the non-movant's claim, the

movant must identify areas that are essential to the claim in which there is an "absence of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  However, the movant "need not negate the elements of the non-movant's case." *Boudreaux v. Swift Transp. Co. Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

Mere conclusions and allegations are not summary judgment evidence and cannot be used to defeat or support a motion for summary judgment. *Topalian v. Ehrman,̦* 954 F.2d 1125, 1131 (5th Cir. 1992).  To successfully oppose a motion for summary judgment, the non-movant must present specific facts showing "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc.*, *v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003).  If the non-movant fails to point out evidence opposing summary judgment, it is not the court's duty to search the record for such evidence. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

### B.   Qualified Immunity

Defendants assert the defense of qualified immunity, which is an affirmative defense which shields public officials from civil liability for acts committed pursuant to their authorized duties.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Manis v. Lawson*, 585 F.3d 839, 845-846 (5th Cir. 2009).  Qualified immunity protects government employees against claims brought against them in their individual capacities "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wernecke v. Garcia,* 591 F.3d 386, 392 (5th Cir. 2009) (quoting *Harlow*, 458 U.S. at 818) (internal quotation marks omitted).  "Qualified immunity gives

government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011).

This protection is extended to "'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). It is applicable regardless of whether a government official's reasonable error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez,* 540 U.S. 551, 567 (2004)). The official is immune from suit if the law at the time of the constitutional violation does not give him fair notice that the conduct is unlawful. *Manis*, 585 F.3d at 846 (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

Determining whether a public official is entitled to qualified immunity entails a two-part inquiry by the reviewing court. *See Pearson*, 555 U.S. at 232. The first prong of the analysis asks whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the official's conduct violated a constitutional right that was "clearly established" at that time. *See id.* at 815-16; *Scott v. Harris*, 550 U.S. 372, 377 (2007) (citation omitted). The second prong of the analysis asks whether qualified immunity is appropriate, notwithstanding an alleged violation, because the defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Hampton Co. Nat'l Sur., L.L.C. v. Tunica County, Miss.*, 543 F.3d 221, 225 (5th Cir. 2008) (quoting *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007)). There is no mandatory sequence that the court must follow in applying the two parts of the qualified

immunity test.  *Pearson*, 555 U.S. at 236.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense.  *See Gates v. Texas Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).  An official need only plead his good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law.  *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)). The plaintiff bears the burden of negating the defense and cannot rest on conclusory assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct.  *See Michalik*, 422 F.3d at 262; *see also Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009) (noting that, to avoid summary judgment on qualified immunity, a plaintiff need not present "absolute proof," but must offer more than "mere allegations") (quotation omitted).

## III.   **DISCUSSION**

Wilson's complaint is governed by 42 U.S.C. § 1983, which provides a remedy for violations of civil rights by state actors:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for

vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979)).  Thus, to state a claim under 42 U.S.C. § 1983, a plaintiff must show a violation of the Constitution or of federal law, and then show that the violation was committed by someone acting under color of state law.  *See Atteberry v. Nacona General Hosp.*, 430 F.3d 245, 252-53 (5th Cir. 2005) (citing *West v. Atkins*, 487 U.S. 42, 48-50 (1988); *Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir. 1995)).

### A.    Appendicitis and Deliberate Indifference Claim

**Individual Claims Against Nurse Bocage.**  Wilson complains that Nurse Bocage ignored his need for adequate medical care when he developed appendicitis.  Nurse Bocage contends that the medical records attached to Defendants' motion for summary judgment demonstrate that Wilson was provided adequate care and that she was not deliberately indifferent to his serious medical needs.

Wilson's jail records reflect that he was booked into the HCJ on a charge of burglary of a habitation [HCSO p. 1].  A pretrial detainee's rights are based on the procedural and substantive due process guarantees of the Fourteenth Amendment.  *Kitchen v. Dallas County, Texas,* 759 F.3d 468, 477 (5th Cir. 2014) (citing *Hare v. City of Corinth, Mississippi,* 74 F.3d 633, 639 (5th Cir. 1996)).  Like a convicted felon, a detainee must be provided basic medical treatment by those who are responsible for his custody.  *Silva v. Moses*, 542 F. App'x 308, 310 (5th Cir. 2013) (citing *Hare*, 74 F.3d at 639); *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing *Hare,* 74 F.3d at 650).  This right is violated if custodial officials or health

14

care workers are deliberately indifferent to the detainee's serious medical needs. *Id.*; *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Unsuccessful treatment or negligent denial of treatment is not a constitutional violation. *Gobert*, 463 F.3d at 346.

Deliberate indifference must be proven, and an official is deliberately indifferent to an inmate's needs only when she knows of a serious threat to an inmate's health and knowingly ignores it. *Brewer v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). To prove deliberate indifference, Wilson must show that Nurse Bocage "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (quoting *Domino v. Tex. Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001)).

Bocage also asserts that she is entitled to qualified immunity which shields her from liability for discretionary acts performed within the scope of her authority. *See Harlow*, 457 U.S. at 815-19. Therefore, even if Wilson was injured by Bocage's actions or omissions, the Court cannot make a finding of liability if her "conduct was objectively reasonable." *Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 408 (5th Cir. 2007) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir.1990)).

The records refute Wilson's claim that Bocage–or any health care provider–was deliberately indifferent to his complaints about his appendicitis. *Gobert*, 463 F.3d at 346 - 347; *see also Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Mendoza v. Lynaugh*, 989 F.2d 191, 193-95 (5th Cir. 1993). On the contrary, they show that Wilson was

15

seen and evaluated almost immediately after he first reported his symptoms [Doc. # 41-2, p. 3; HCSO pp. 377, 379]. Although the attending physician had initially mis-diagnosed Wilson's ailment, Wilson was sent to LBJ Hospital and was given an appendectomy when the doctor realized that his ailment was serious. *Id.* Any pain or harm that may have occurred due to the delay in taking Wilson to the hospital was the result after HCJ medical personnel made a good faith effort to determine Wilson's malady. All jail and medical officials are entitled to qualified immunity and cannot be held liable where there is no indication that anyone deliberately ignored a known serious risk to Wilson's health. *Sibley v. Lemaire,* 184 F.3d 481, 489 (5th Cir. 1999). Further, deliberate indifference has not been established because there is no record evidence showing that the seven hour delay actually caused any permanent injury Wilson. *Mendoza v Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

Moreover, it must be shown that the named defendant was personally involved in the alleged deprivation before she can be held liable for the plaintiff's injuries due to a civil rights violation. *James v. Texas Collin County*, 535 F.3d 365, 373 (5th Cir. 2008). There is no evidence in the records that demonstrates that Bocage personally engaged any conduct that harmed Wilson or unreasonably endangered his health. The records show that Bocage was only involved in the initial stages of evaluating Wilson's condition [HCSO p. 377]. She took his vital signs and then referred him to a physician for further evaluation [HCSO p. 379]. Bocage's referral of Wilson to a physician for diagnosis of his condition is sufficient to demonstrate she was not deliberately indifferent to his health needs. *Hasty v. Johnson*,

103 F. App'x 816, 819 (5th Cir. 2004). Therefore, Nurse Bocage is entitled to summary judgment with regard to her individual liability because there are no genuine issues of material fact regarding Wilson's claims of deliberate indifference to his medical needs.[4]

**Official Capacity Claims.** Wilson has also asserted claims against Defendants in their official capacities. A suit against a defendant in his official capacity is, in reality, a suit against the government entity which the defendant serves, in this case Harris County. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). To assert a claim against a government employee in her official capacity, the plaintiff must show that a government policy was behind the alleged deprivation. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). In addition to failing to show that Bocage, or any official, was deliberately indifferent to his health, Wilson has failed to produce any evidence or articulate any facts that show that he was denied medical care pursuant to an official policy. Consequently, any claims regarding medical care brought against Defendants in their official capacities shall also be dismissed. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985); *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 849 (5th Cir. 2009).

### B.   Excessive Force Claim

**Individual Claims Against Deputy Ballard.** Wilson complains that Deputy Ballard used excessive force against him when Ballard forcibly removed him from a day room to a cell. He further alleges that he had to sit at a table because he was still recovering from his appendectomy and that he was seriously injured as a result of Ballard's actions. Like his

---

[4]     The Court need not reach the issue of Bocage's qualified immunity.

right to medical care as a detainee, Wilson's right not to be subjected to excessive force is based on his constitutional right to due process under the Fourteenth Amendment. *Noel v. Webre*, 426 F. App'x 247, 249-250 (5th Cir. 2011) (citing *Brothers v. Klevenhagen,* 28 F.3d 452, 455–56 (5th Cir. 1994); *Valencia v. Wiggins,* 981 F.2d 1440, 1443–45 (5th Cir. 1993)). The key issue in reviewing such claims is determining whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 5–10 (1992); *Valencia,* 981 F.2d at 1446).  Factors to be considered are "the extent of injury suffered," "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'"  *Kitchen v. Dallas County, Tex.*, 759 F.3d 468, 477 (5th Cir. 2014) (quoting *Hudson*, 503 U.S. at 7); *see also Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013) (citing *Rockwell v. Brown,* 664 F.3d 985, 991 (5th Cir. 2011)).

Defendants have presented evidence showing that Deputy Ballard ordered the jail inmates in his housing area to return to their bunks after he observed that some of them were communicating with inmates in another area[HCSO p. 149].  Apparently, Deputy Ballard issued the directive in order to maintain order.  The federal courts have long recognized the need for correctional officers to have the authority to exercise control over prisoners in order to maintain order and safety in the prisons and jails. *See Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006) ("It is well established that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates.") (citing *Farmer,* 511

U.S. at 832-33).  All of the inmates complied except Wilson, and Deputy Ballard repeated his order to Wilson five times before calling Deputy Brown for help [HCSO p. 149].  Deputy Ballard was aware that Wilson was recovering from surgery, so he consulted with a nurse before taking any steps to physically move him.  *Id.*  When the nurse assured Ballard that he could move Wilson, Ballard was not unreasonable in taking further action in reliance of her assessment.  *See Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001).

Although Deputy Ballard was confident that he could use some force to remove Wilson, he tried again to use only a verbal command to achieve his purpose [HCSO p. 149]. Instead of complying, Wilson refused and became argumentative.  *Id.*  Ballard then grabbed Wilson by the sleeve and tried putting restraints on him.  *Id.*  Wilson resisted by throwing himself on the floor, twisting away from Ballard, and even trying to bite him.  *Id.*  Deputy Ballard was able finally to restrain and move Wilson after wrestling with him, turning Wilson over on his stomach, and getting his arms behind his back.  *Id.*  In a related jail disciplinary proceeding, Wilson pleaded guilty to assaulting Deputy Ballard.  Wilson then was punished for committing an assault against Ballard [HCSO pp. 135, 146].

Deputy Ballard has asserted qualified immunity and accordingly, the Court must determine whether his actions were objectively unreasonable, in light of clearly established law, and in light of information that he possessed at the time the use of force occurred. *Rockwell,* 664 F.3d at 991; *Wagner v. Bay City, Tex.,* 227 F.3d 316, 321 (5th Cir. 2000).  In making this determination, the Court must keep in mind the circumstances facing Deputy Ballard working in a jail and trying to control inmates, many of whom have been charged

with violent offenses.  *See Graham v. Connor*, 490 U.S. 386, 396-397 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," is a constitutional violation) (quoting *Johnson v. Glick,* 481 F.2d, 1028, 1033 (2d Cir. 1973). "The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force." *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983) (quoting *Johnson v. Glick*, 481 F.2d at 1033).  Given Wilson's documented history of psychotic behavior,[5] Ballard and other guards had to maintain control when dealing with Wilson.  They were not unreasonable to address his unpredictable nature to avoid problems for inmates and officials alike.  *See, e.g., Gates v. Cook*, 376 F.3d 323, 335 (5th Cir. 2004).

It is undisputed in the records that Deputy Ballard used force against Wilson.  It is also undisputed that Wilson was defiant and violent.   Indeed, Wilson admitted to a disciplinary tribunal that he assaulted Deputy Ballard and he was found guilty of this behavior.  He was disciplined for committing an HCJ rules infraction [HCSO p. 146]. Wilson's admission to the disciplinary hearing officer is an admission in this case that is strong evidence in support of Ballard's factual position that Wilson assaulted him and that Ballard's response was not unreasonable or an excessive use of force.[6]  In light of Wilson's

---

[4]     *See* footnote 2.

[5]     If Wilson had forfeited time credits as a result of the finding of guilt, his use of excessive force claim would be barred as a challenge to the validity of the length of his incarceration.  *See Edwards v. Balisok*, 520 U.S. 641, 443 (1997) (citing *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)); *Sappington v. Bartee*, 195 F.3d 234 (5th Cir.
                                                                                       (continued...)

defiant and violent behavior, Deputy Ballard was authorized to use reasonable force in order to control Wilson and to maintain discipline in the jail housing area. *Baldwin v. Stalder*, 137 F.3d 836, 840 (5th Cir. 1998).

Alternatively, a plaintiff in an excessive use of force case must prove some injury resulting from the use of force, although he is not required to prove significant injury. *See, e.g., Hudson*, 503 U.S. at 9. The summary judgment evidence refutes Wilson's allegations regarding the injuries he suffered from Ballard's actions. Wilson alleges that his drainage tube was ripped from his abdomen and that he sustained a fractured and dislocated jaw which had to be wired shut [Doc. # 1, p. 7; Doc. # 13, p. 9]. He also claims that his teeth were loosened and that he received numerous cuts and bruises. These allegations are contradicted by the medical records. Contrary to Wilson's assertions, the nurse examining him after the altercation found no open wounds or visible injuries on him [HCSO p. 154]. In addition, Wilson's medical records reflect that he already had a dislocated jaw which had been wired shut months before the incident occurred [HCSO pp. 487-494]. Finally, Wilson's records

---

(...continued)

1999). However, Wilson received discipline of loss of 30 days of visitation and commissary privileges [HCSO p. 135]. Therefore, *Heck* does not apply. While *Heck* does not bar Wilson's excessive force claim, he is foreclosed under Fifth Circuit authority from arguing here that he was wrongly charged with assaulting Deputy Ballard. *Harris v. Smith*, 482 F. App'x 929, 930 (5th Cir. 2012) (citing *Collins v. King,* 743 F.2d 248, 253 (5th Cir. 1984)); *see also Sanchez v. Grounds*, __ F. App'x ___, 2015 WL 294713, *2 (5th Cir. 2015) (citing *Woods v. Smith,* 60 F.3d 1161, 1165 n. 16 (5th Cir. 1995)); *Peterson v. Johnson*, 714 F.3d 905, 913-917 (6th Cir. 2013) (hearing officer's finding that prisoner grabbed guard's hand had preclusive effect on the prisoner's subsequent civil rights claim against guard for use of excessive force).

reveal that he was suffering from many of the complained of ailments before the alleged assault [HCSO p. 154].

Last, while it is possible that Wilson was injured while fighting with Deputy Ballard, the summary judgment evidence identifies Wilson as the instigator.  The record shows that Deputy Ballard used only enough force to subdue Wilson and move him to a cell. Consequently, Ballard did not violate Wilson's constitutional rights because his use of force against Wilson was not unnecessary or disproportionate to the need to take action in response to Wilson's defiant and violent behavior.  *Jackson v. Kelly*, 512 F. App'x 386, 389 (5th Cir. 2013) (citing *Baldwin,* 137 F.3d at 838-839; *Hudson,* 503 U.S. at 7).

Therefore, Deputy Ballard is entitled to summary judgment with regard to his individual liability.  There are no genuine issues of material fact regarding Wilson's claims of use of excessive force.

**Official Capacity Claims.**  As previously discussed, Wilson's claims against Defendants in their official capacities are actually claims against Harris County.  *Hafer*, 502 U.S. at 25.  Like his claims regarding medical care, Wilson fails to show that he was subjected to excessive or unreasonable force in violation of his constitutional rights.  In addition, Wilson fails to assert facts that indicate that Harris County had a policy condoning assaults by guards on jail inmates.  *Sanders-Burns v. City Of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (government entities and defendants in their official capacities can only be held liable for violations if the violations arose from an official policy or practice) (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989)).  Wilson only alleges a single incident of

a guard using excessive force.  Allegations of isolated instances of deprivations alone do not establish liability of the policy maker.  *Tuttle*, 471 U.S. at 823-24; *Peterson v. City of Fort Worth*, Tex. 588 F.3d 838, 851 (5th Cir. 2009).  Wilson's use of force claim against Defendant Ballard in his official capacity must also be dismissed.

### C.   <u>Access to Courts — Grievances</u>

Wilson claims that Sheriff Garcia violated his right of access to the courts because he was not provided assistance in gaining meaningful access to the HCJ grievance process [Doc. # 1, p. 14; Doc. # 13, p. 12].  He alleges that he is mentally handicapped and needed help in filing grievances.  *Id.*  Wilson claims that he asked for help on numerous occasions but no assistance was ever provided to him [Doc. # 1, p. 14].  Wilson claims that Sheriff Garcia maintains a pattern and practice of denying assistance to inmates with mental disabilities. *Id.*  When asked by the Court about what claims he was working on and the parties involved, Wilson answered that the parties and claims are the same as those under consideration in the instant suit [Doc. # 13, p. 13].  He also admitted that he was not aware any specific instance in which he was substantially delayed in or prevented from seeking review of his claims as a result of the alleged denial of access to the courts [Doc. # 13, p. 13].

An inmate's right of meaningful access to the courts is protected by the Constitution. *Bounds v. Smith*, 430 U.S. 817, 828 (1977); *Terry v. Hubert*, 609 F.3d 757, 761-762 (5th Cir. 2010).  The right of access to the courts includes the ability to file grievances that comply with the established procedural requirements.  *See Smith v. Dretke*, 215 F. App'x 358, 359 (5th Cir. 2007). However, the right of access to the courts only encompasses a reasonably

23

adequate opportunity to file non-frivolous legal claims challenging convictions or conditions of confinement.  *Johnson v. Rodriguez,* 110 F.3d 299, 310–311 (5th Cir. 1997).  When an inmate claims that he has been denied access to the courts or, in this case, the jail's grievance process, he must show that his position as a litigant has been prejudiced by the defendant's actions.  *Brewster v. Dretke*, 587 F.3d 764, 769 (5th Cir. 2009) (citing *Lewis v. Casey,* 518 U.S. 343, 351 (1996)).

Defendants have presented records showing that Wilson was able to utilize the HCJ grievance process on five different dates [Doc. # 41-3, pp. 4, 6].  The record of multiple grievances undermines Wilson's contention that he has been denied the right of access to the courts. *See Beck v. Lynaugh*, 842 F.2d 759, 762 (5th Cir. 1988).  Wilson's claim that he was denied access to the courts must be dismissed because he has failed to demonstrate that he has suffered any injury as a result of the alleged violations of his rights.  *See Palmer v. Daniel*, 568 F. App'x 302 (5th Cir. 2014) (citing *Brewster,* 587 F.3d at 769).

## IV.   <u>CONCLUSION</u>

For all the foregoing reasons, Wilson has failed to show that there is a genuine issue of material fact on any claim he has against any of Defendants. The Court therefore grants judgment in favor of Defendants.  It is therefore

**ORDERED** that Defendants' motion for summary judgment motion  [Doc. # 41] is **GRANTED**.  It is further

**ORDERED** that this prisoner civil rights suit is **DISMISSED with prejudice**.

24

The Court will issue a separate final judgment.

The Clerk is directed to provide a copy of this Memorandum and Order to the parties.

SIGNED in Houston, Texas, on February 27th, 2015.

Nancy F. Atlas
United States District Judge